LINDYLEE G. KROOP *v.* SAMUEL KROOP

PARSKEY, ARMENTANO, SHEA, DALY and COVELLO, Js.

Argued November 13, 1981—decision released February 9, 1982

*Richard L. Goldblatt,* for the appellant (defendant).

*James O. Shea,* for the appellee (plaintiff).

PARSKEY, J. This case was heard, upon reference, by the Hon. Raymond J. Devlin, state referee, who, exercising the powers of the Superior Court, rendered a decree dissolving the marriage and ordering for the benefit of the plaintiff property and monetary awards and counsel fees. In his appeal, the defendant claims that (1) the order of reference was erroneous, (2) the property and monetary awards were excessive, and (3) the award of counsel fees was erroneous. We disagree.

The parties were married January 26, 1969, and have one child, Joshua, age 8, issue of the marriage. Prior to the marriage, the plaintiff had had little

work experience. The defendant, on the other hand, had been working for many years in a clothing business. Previously the defendant had attempted to purchase a business known as Shure Tours but was unable to do so because of lack of funds or financing. After the plaintiff became engaged to the defendant, the plaintiff's father, Marvin Gold, agreed to arrange financing for the purchase of Shure Tours because he believed that the chances of a successful marriage would be enhanced by the couple's having a business interest in common.

The parties searched for a business and decided that Shure Tours was satisfactory for their needs. In return for Marvin Gold's help and the contribution of the plaintiff in the amount of approximately $20,000, the parties reached an agreement that the plaintiff and the defendant each would own one-half of the business known as Shure Tours upon the closing. Although the defendant received $16,000 from the sale of his interest in a clothing business and $7500 from the sale of his interest in a piece of real estate, none of these assets was utilized in the purchase of Shure Tours.

The interest in the business was transferred on March 4, 1969. Initially, the plaintiff and her father endorsed bank notes in the amount of $70,000 and contributed approximately $28,000 in cash. The stock in the corporation known as Shure Tours was purchased for approximately $98,000. The defendant could not have obtained the financing necessary for the purchase without the endorsements or guarantees of the plaintiff's father and the plaintiff. In May of 1969, a friend of the defendant purchased a 10 percent interest in the entity out of the defendant's share. Because the stock record books could

not be found, no shares of stock were issued at the time of the purchase nor were any shares of stock ever issued. Without the knowledge of the plaintiff, the defendant filed tax returns on behalf of the corporation, showing himself to be a 90 percent owner and his friend a 10 percent owner.

Through the years, numerous financial statements were prepared by the defendant but none of them indicated that he had borrowed any money from the plaintiff or from his father-in-law. Until the time of the domestic breakdown in 1976, the plaintiff contributed her full time and effort to the business except for a short period of time following the birth of their child, spending more time in the business than did the defendant. Since the domestic breakdown, the plaintiff has continued to work at the business but has not spent as much time as before the breakdown.

The bank loans were gradually reduced. The payments on the loans were made from corporate funds and charged on the books of Shure Tours as loans to officers. As business permitted, Shure Tours at year end paid a bonus to the defendant. This bonus was used to reduce the officers' loan account in which payment to the banks and withholding tax payments had been shown as loans to officers. On many occasions, the defendant would remove cash from the limousine funds or cash sales of Shure Tours for his personal account. These sums would later be charged to the defendant at year end as adjusting entries. During the years, endorsements or guarantees by both the plaintiff and her father were utilized to obtain financing when the business required additional funds.

In 1972 the parties purchased a home which had been partially destroyed by fire. The house was restored using the funds from a mortgage, a contribution of approximately $8600 from the plaintiff, and a contribution of approximately $7600 from the defendant. After the parties separated, the property was sold at a profit of approximately $45,000. This fund has been held in escrow drawing interest except that $7500 was authorized to be withdrawn to pay part of the defendant's income tax.

The day to day work of the plaintiff and the defendant in the operation of the travel agency was interchangeable. The plaintiff, despite her minimal business experience before the marriage, had acquired complete knowledge of the business of Shure Tours. At the time of trial, she not only was competent to operate the business but she was also able to obtain approval from the airlines for the continuation of the business. She is able to operate the business while rearing her child.

In 1974, the defendant became involved with another woman. This affaire de coeur, which the plaintiff discovered in 1976, was the precipitating factor which resulted in the irretrievable breakdown of the marriage.

In the decree dissolving the marriage, the trial court awarded custody of the minor child to the plaintiff and also ordered the defendant to pay $100 per week child support together with specified medical insurance coverage and $500 monthly alimony for two years. With respect to Shure Tours, acting pursuant to General Statutes § 46b-81, it transferred the defendant's "90%" interest in the stock of the travel agency to the plaintiff and also ordered that the defendant receive severance pay

of $200 per week for one year from the date of the decree. Additionally, it ordered that the balance of the $45,000 in funds being held in escrow from the sale of the marital home be transferred to the defendant.

I

The plaintiff brought this action for dissolution of her marriage in 1977. In her complaint she alleged two grounds for dissolution, irretrievable breakdown and intolerable cruelty. In his answer, the defendant admitted the allegation of irretrievable breakdown but denied intolerable cruelty. He also filed a cross complaint making similar allegations to which the plaintiff responded in identical fashion. On April 27, 1978, after the pleadings were closed, the defendant filed a motion that the matter be referred to a state referee. The court, *Aspell, J.,* acting pursuant to General Statutes § 46b-9 (then § 51-340, originally § 51-182m), referred the matter to the Hon. Elmer W. Ryan, state referee. In April, 1978, acting pursuant to the defendant's motion alleging "that the referee is burdened with many hearings and the defendant's case has been pending for a long period of time and should be resolved without further delay," the court, *Mulvey, J.,* revoked the earlier reference.

In July, 1979, James O'Connor Shea, attorney for the plaintiff, sent a letter to Judge Reynolds, presiding judge of the Domestic Relations Division of the Superior Court for the judicial district of New Haven, advising him of the status of the case and inquiring "if there is some way that we might get this case disposed of?" A copy of this letter was sent to Richard L. Goldblatt, attorney for

the defendant. Thereafter, on July 26, 1979, the court, *Reynolds, J.,* acting pursuant to § 46b-9, referred the case to the Hon. Raymond J. Devlin, state referee.

In response to the court's action, Goldblatt, on July 27, 1979, sent a letter to Judge Reynolds in which he protested the appropriateness of Shea's letter and requested that the order of reference be revoked and that Shea be required to request a hearing on the reference in which Goldblatt could participate. The written request and a subsequent oral request by Goldblatt to the court to the same effect were both denied and no further action was taken by the court in the matter. These informal requests would not have constituted motions because they did not conform to the requirements of Practice Book § 196 which specifies that all motions except those made during trial shall be in writing and served upon the parties in accordance with the usual practice. At no time has the defendant asserted that the trial referee was disqualified for any reason nor has he claimed that the trial was unfair in any respect.

Ordinarily, cases may not be referred for hearing and decision without the written consent of the parties. General Statutes § 52-434; Practice Book § 430. The appointment of a particular referee, however, is the function of the court or judge; recommendations may be made by counsel only at the request of the court or judge. Practice Book § 431. Except in the case of condemnation matters, an order of reference is interlocutory in nature. *Cone* v. *Darrow,* 148 Conn. 109, 112, 167 A.2d 852 (1961). Accordingly, the defendant's only recourse was to await final judgment before he could challenge the order.

In family relations matters, however, after the issues are closed, the court may refer the case or matter without consent of the parties. General Statutes § 46b-9;[1] *Gluck* v. *Gluck,* 181 Conn. 225, 229, 435 A.2d 35 (1980). Where the matter is contested, the court may refer the case either on its own motion or on motion of a party. Practice Book § 458. There is no requirement in § 458 that a contested matter appear on a contested list before it may be referred. A case is contested for this purpose if either child custody or the grounds for the dissolution are in dispute. Practice Book § 474.

In the present case, according to the pleadings, one of the grounds, viz., intolerable cruelty, was in dispute both in the complaint and in the cross complaint. The court was, therefore, justified in referring the case on its own motion. The fact that the stimulus for the court's action was a letter of inquiry from one of the parties is immaterial. While it would have been preferable for the court to have given the defendant an opportunity to be heard before taking its action, its failure to do so is not

---

[1] "[General Statutes] Sec. 46b-9. (Formerly Sec. 51-340). HEARING BY REFEREE IN ACTION FOR DISSOLUTION OF MARRIAGE, LEGAL SEPARATION OR ANNULMENT. In any action for dissolution of marriage, legal separation or annulment the court may refer the case or any matter in which the issues have been closed to a state referee who shall have been a judge of the referring court or who shall have been a judge of the court of common pleas; provided the referring court shall retain jurisdiction to hear and decide any pendente lite or contempt matters until such time as the referee hears and decides the case or matter. The chief court administrator, or his designee, may authorize the presiding judge to refer to such state referee any action for the dissolution of marriage, legal separation or annulment which is on the family relations uncontested assignment list. Such uncontested assignment list matters shall be heard on the date on which they are assigned to be heard on the uncontested assignment list, and if they are not heard on such date the reference shall be automatically revoked. Any hearing by such referee shall be conducted as provided in section 52-434."

fatal. Nor, in the absence of a claim that the trial referee was disqualified, was the denial of a hearing after the referral fatal. The fact that the defendant, without waiving any right to challenge the reference, was entitled to a full hearing on the merits before the trial referee, is sufficient to satisfy the requirements of due process. See *Haverin* v. *Welch,* 129 Conn. 309, 315, 27 A.2d 791 (1942).

At this point a word of caution is appropriate. It is true that in April, 1979, some three and one-half months before the disputed reference, the defendant was pressing for the case to be tried without further delay. Further, before ordering the reference, the court, after checking with three potentially available referees and discovering that two of them were "booked solid," thereafter referred the case to the referee who could schedule the case for trial in the early part of September, 1979. Nevertheless, the preferred course, in the absence of consent or exigent circumstances, would have been to schedule the court's motion for a hearing. When parties are given their day in court, then justice satisfies the appearance of justice. When they are not afforded such opportunity, the reality of justice is sometimes blurred by the mist of imperception. In this case, of course, the defendant did not avail himself of the opportunity to file a motion to revoke the reference to which he objected and in this manner obtain a hearing in open court regarding those objections.

## II

The defendant contends that the trial court's decision to transfer the business to the plaintiff was clearly excessive and an abuse of discretion. We disagree. The evidence supports the trial court's conclusion that the plaintiff actually held a 50 per-

cent interest in the business and the silent partner a 10 percent interest. That being so, the defendant's interest in Shure Tours was actually 40 percent, not the 90 percent he claims. It follows that the plaintiff was entitled to 50 percent of the distributed profits of the business from the beginning. Although distributions to the plaintiff and to the defendant were reflected on the corporate records as salary, it is clear that the parties intended them to be distributions of profit. The testimony and exhibits reveal that the plaintiff had received only $67,000 representing her total salary for the period 1969–1979. The total amount of profit distributed to the defendant as salary during that time was about $302,000. From those funds the defendant paid out approximately $72,390 to banks on various loans to the business. The profits of Shure Tours between 1969 and 1979, distributions minus loan payments, totaled approximately $296,610. The plaintiff, as 50 percent stockholder and at least an equal contributor of effort, was arguably entitled to 50 percent of $296,610, or $148,305. Having received only $67,000, the amount of $81,305 is due her. This is approximately the amount of the current value of the entire business, $90,000. Also due the plaintiff is her percentage of monies appropriated from the limousine funds and cash sales by the defendant for his own use.

The defendant's claim that Shure Tours must reimburse him for loan payments he made on business debts to various banks is without merit. The evidence shows that those payments made "by the defendant" were actually paper transactions, funds the business credited to him as salary, bonuses, or "loans to officers" intended to be used to pay off loans of Shure Tours. Furthermore, the

defendant's present claim that the value of the business was more than twice the figure accepted by the trial court is not substantiated by the record. The trial court was justified in relying on the figure of $90,000 supplied by the defendant himself on his financial statement.

### III

The defendant's claim of excessiveness with respect to the financial orders is directed at the orders when considered in the entirety. Having considered and rejected the defendant's major claim in this respect, namely, the disposition of Shure Tours, the remaining orders of alimony and support do not appear to us to be unreasonable. This is especially true when these orders are balanced against the order of severance pay in the defendant's favor.

The defendant's challenge to the $10,000 allowance for counsel fees is also without merit. Despite the defendant's protestations to the contrary, the decree is not one-sided. In the latter part of 1976, the parties realized $45,000 in net proceeds from the sale of the marital home. This sum, except for $7500 released by order of the court for the benefit of the defendant, has been held in escrow in an interest bearing account awaiting the outcome of the present litigation. As part of the decree, this fund has been ordered released to the defendant leaving him with substantial liquid funds. Although the defendant claims that his tax and other financial obligations far exceed the escrow funds, the trial referee was not obliged to accept this claim at face value.[2] The

---

[2] The defendant asserts, for example, that he will be subject to a substantial capital gains tax because of the transfer of his interest in Shure Tours to his wife. It is not at all clear that the feared tax consequences are likely to follow from the ordered transfer. While transfers of corporate stock to a spouse are regarded as tax-

property division and orders of alimony and sup-; port make up a settlement well balanced between the plaintiff and the defendant, who was left with a considerable amount of cash. In view of all the circumstances, the award of counsel fees was fair. *Arrigoni* v. *Arrigoni*, 184 Conn. 513, 519–20, 440 A.2d 206 (1981).

There is no error.

In this opinion the other judges concurred.

able events for the purpose of captial gains taxes whether such transfers are made pursuant to a property settlement agreement; *United States* v. *Davis*, 370 U.S. 65, 71, 82 S. Ct. 1190, 8 L. Ed. 2d 335 (1962); or court order; *Pulliam* v. *Commissioner of Internal Revenue*, 329 F.2d 97, 100 (10th Cir.), cert. denied, 379 U.S. 836, 85 S. Ct. 72, 13 L. Ed. 2d 44 (1964); such transfers are not taxable when, as is the case here, the spouse to whom the transfer is made already possesses the beneficial interest in the stock and the purpose of the transfer is to restore to her the full value of that interest. See Cook, T. C. Memo 1964-232.