[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage. The plaintiff, Edward Corcoran, and the defendant, Jean Corcoran, were married at Waterbury on August 3, 1985. Therefore, by the date this action was returned to court in August 1993, they had been married eight years. There are no minor children issue of the marriage.
The issues between the parties are what continuing duty, if any, Mr. Corcoran has to support Mrs. Corcoran, and whether a fraudulent transfer of the parties' trucking business occurred, thereby depriving Mrs. Corcoran of any equitable share she might have had in the business. If such a transfer occurred, the further question arises of how to compensate Mrs. Corcoran for the loss of her equitable share by way of appropriate dissolution orders.
In an Answer and Amended Cross-Complaint of December 28, 1993 Mrs. Corcoran alleged in the second count that Mr. Corcoran had fraudulently transferred to a third party all of his right, title and interest in the shares of corporate stock in Corcoran's Transportation, Inc., identified as "the largest single material asset of the parties". At the same time she moved to implead as a third party defendant Jennie Finkle, and that motion was granted (Harrigan, J.) on May 10, 1994. The testimony at trial established, among other things, that Mrs. Finkle and Mr. Corcoran enjoyed a close personal relationship during the period of time crucial to the court's decision in this case, i.e., 1993 and 1994, and that she is now the sole owner of E.J. Corcoran Transportation, Inc., an enterprise engaged in the same business, except for long-hauling, as was Corcoran's Transportation, a business purchased by Mr. and Mrs. CT Page 5433-A Corcoran in 1986. Mr. Corcoran is employed by Mrs. Finkle as the "operations manager" for E.J. Corcoran Transportation, the same title he assumed at Corcoran's Transportation.[1] In the third party complaint Mrs. Corcoran alleged that Mrs. Finkle had purchased the stock of Corcoran's Transportation for less than adequate consideration or for valuable consideration other than money with the intent to defraud her and sought the return of the stock certificates allegedly held by Mrs. Finkle and the face value of any stock that she had sold or transferred or rendered otherwise unable to be returned to Mrs. Corcoran.
Chronology
In order to understand the events of 1993 and 1994 which control the court's decision in this matter it is necessary to set forth in greater than usual detail the chronology of the parties' relationships. The romantic relationship of Mr. and Mrs. Corcoran began in 1982, although they were not married until August of 1985. In 1983 the parties established a business known as EJC Transportation, Inc. and worked together in that business.
In 1986, for $156,000, Mr. and Mrs. Corcoran purchased from Mr. Corcoran's mother all of the outstanding stock in Corcoran's Transportation, a trucking company established by Mr. Corcoran's father and for which he had worked for several years. They signed an agreement to pay for the stock in installments and pledged their recently-purchased family home as collateral. By 1988 they had stopped paying on their agreement, and Mr. Corcoran's mother had brought suit against them, attaching the family home.
During this period (1985-1989) the parties had been operating EJC Transportation and borrowing money to keep it afloat. Mrs. Corcoran was an active and equal partner throughout this period. In 1989 they decided to cease the operations of EJC Transportation and to "reopen" Corcoran's Transportation. At this same time the parties separated, and Mr. Corcoran began a divorce action, which was subsequently withdrawn. In early 1990 the parties resumed living together, attempting a reconciliation. Their financial affairs do not seem to have improved, however, because they filed the first of two bankruptcy petitions in 1990 as well, and a foreclosure action on the family home was begun, leading to a judgment in July of 1991. Mrs. Corcoran continued to be an active participant in the CT Page 5433-B business of Corcoran's Transportation.
In February 1993 Mr. Corcoran left Mrs. Corcoran for good, and in that same month met Mrs. Finkle[2]. During the spring of 1993 their relationship had progressed to the point where they travelled to Florida together on at least one occasion, and Mrs. Finkle travelled to Florida to persuade Mr. Corcoran's mother to drop her lawsuit against the parties and release the attachment on their home. She did so after Mrs. Finkle paid her $20,000. In May 1993 Mr. and Mrs. Corcoran executed a "property settlement" concerning certain terms of a proposed dissolution. According to that agreement (Exhibit P), at the time a dissolution would enter Mrs. Corcoran was to assign her stock in Corcoran's Transportation to Mr. Corcoran, and she would resign as an officer and director of the corporation. In July 1993, however, before this divorce action had been begun, those steps were taken, and they are evidenced by Exhibits R and S.
Within two weeks after Mrs. Corcoran had transferred her interest in the stock of Corcoran's Transportation to him, Mr. Corcoran transferred all his right, title and interest in that stock to Mrs. Finkle. (See Exhibit U) And, on July 22, 1993 Mrs. Finkle purchased all of the stock in EJC Transportation, the trucking business Mr. and Mrs. Corcoran had established in 1983, and entered into a consulting agreement with Mr. Corcoran for him to provide services to EJC Transportation under Mrs. Finkle's direction. (See Exhibit U.) Mr. Corcoran began this action in the next month, August 1993.
While these events were transpiring in 1993, Mrs. Corcoran stopped working for Corcoran's Transportation, and Mrs. Finkle began to appear at the offices of Corcoran's Transportation. By the fall of 1993 she had her own office there. Having replaced Mrs. Corcoran in Mr. Corcoran's affections, Mrs. Finkle had now replaced her in the business. She worked for the company throughout 1994 while Mr. Corcoran continued doing business. It was during this period of time that Mrs. Finkle was impleaded as a third party defendant in this action. During 1994 Mr. Corcoran testified that he borrowed approximately $101,000 from Mrs. Finkle for the operations of Corcoran's Transportation. No documentation of any such transactions was provided to the court, although Mrs. Finkle testified that she loaned sizeable sums of money to the corporation or to Mr. Corcoran during that period.
In March 1994, according to Mr. Corcoran's testimony, the CT Page 5433-C earlier stock transfer from him to Mrs. Finkle was "nullified". Mrs. Finkle never executed any documents transferring her rights in the stock back to Mr. Corcoran, although Mr. Corcoran did repay Mrs. Finkle the $20,000 she had paid his mother in May 1993 for her release of the attachment on the family home and her withdrawal of the action against Mr. and Mrs. Corcoran. (See Exhibit V.)
Mrs. Finkle, a person without any prior experience in the trucking business and while still employed by Corcoran's Transportation, in November 1994 incorporated a trucking company known as E.J. Corcoran Transportation, Inc. In the same month that company was added to Corcoran Transportation's insurance policies. During the succeeding several months Mr. Corcoran began referring business from Corcoran Transportation to E.J. Corcoran Transportation.
In February 1995 Mr. Corcoran testified that he closed down Corcoran's Transportation, although it remains an existing Connecticut corporation. In May Mr. Corcoran went to work for Mrs. Finkle at E.J. Corcoran Transportation. She testified that she began her business "full force" at about this time. At the time of trial, January-June 1996, Mr. Corcoran and Mrs. Finkle maintained this business relationship.
The Third Party Defendant's Motion to Dismiss
Pursuant to Section 302 of the Practice Book, the third party defendant, Mrs. Finkle, at the close of the defendant's case filed a motion to dismiss the action as against her for failure to make out a prima facie case. A judgment of dismissal for failure to make out a prima facie case is proper "when the evidence produced . . ., if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of", in this case, the third party plaintiff.Hinchcliffe v. American Motors Corporation, 184 Conn. 607, 609
(1981). When evaluating whether a prima facie case has been established, the evidence offered is to be taken as true and interpreted in the light most favorable to the plaintiff.Wordie v. Staggers, 27 Conn. App. 463, 465 (1992). The right of the court to grant such a motion is to be sparingly exercised; a plaintiff is entitled to every favorable inference that may be legitimately drawn from the evidence, and a party has the same right to submit a weak case as she has to submit a strong one.Fritz v. Gaudet, 101 Conn. 52, 53 (1924). CT Page 5433-D
The essential claim of the motion to dismiss is that, while Mrs. Corcoran, as the third party plaintiff, alleged in her complaint that Mrs. Finkle "purchased the stock of Corcoran's Transportation, Inc. for less than adequate consideration or for valuable consideration other than money with the intent to defraud" Mrs. Corcoran, no evidence was introduced to support that allegation or the related allegation that Mrs. Finkle "has in her possession all outstanding stock certificates of Corcoran's Transportation, Inc. at the present time". See paragraphs 5 and 6 of the third party complaint filed on May 18, 1994 (#110 in the file). On the contrary, Exhibit T is a "stock power" by which Mr. Corcoran "hereby sells, assigns and transfers unto" Mrs. Finkle all of his right, title and interest in all of the common stock of Corcoran's Transportation, Inc. The only "consideration" for this transfer of which the court is aware is Mrs. Finkle's payment of $20,000 to Mr. Corcoran's mother in May 1993 in return for her release of the attachment on the parties' former family home, and that consideration was returned to her by Mr. Corcoran in early 1994. Furthermore, in his response to Mrs. Corcoran's request for admissions (Exhibit 16) Mr. Corcoran answered in the affirmative that, "as a result of (his) transferring Corcoran's Transportation, Inc. to Jennie Finkle (he) received less than fair market value or no consideration for said transfer". That admission is conclusive on Mr. Corcoran. See § 240 of the Practice Book. Elsewhere in this memorandum (See pp. 17-19) the court has made specific findings pointing to the intent to defraud which Mr. Corcoran had and in which Mrs. Finkle participated in connection with this transfer. While there is no evidence that Mrs. Finkle has or ever had the outstanding stock certificates in Corcoran's Transportation in her possession, the court does not consider that to be an essential allegation of the complaint.
Moreover, "[t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically . . . ." Beaudoin v. TownOil Company, 207 Conn. 575, 587-88 (1988). "As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." Tedesco v. Stamford, 215 Conn. 450, 459
(1990). "Whether a complaint gives sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which CT Page 5433-E is to prevent surprise upon the defendant." Waterbury PetroleumProducts, Inc. v. Canaan Oil and Fuel Co., 193 Conn. 208, 223-24
n. 16 (1984).
In this case it was clear from the first day of trial that the gravamen of Mrs. Corcoran's case against both Mr. Corcoran and Mrs. Finkle is not only that shares of stock in Corcoran's Transportation were transferred without valuable consideration but that the business of the business, i.e., the accounts and goodwill of Corcoran's Transportation, was transferred by Mr. Corcoran to Mrs. Finkle in an attempt to defraud Mrs. Corcoran. The case was tried on that premise by all of the parties. No objections were interposed by Mrs. Finkle to the admission of any evidence on the grounds that it varied from the allegations of the complaint. Cf. Cellu Tissue Corp. v. Blake EquipmentCo., 41 Conn. App. 413, 419 n. 2 (1992). Notably, Mrs. Finkle does not contend, nor could she, that she was "surprised, mislead or that [she] would have prepared [her] defense in a different manner had [she] known that the [third-party] plaintiff" was claiming fraud not only in the transfer of stock but also in the transfer of the business of the corporation. See Tedesco v.Stamford, Id., 463.
For these reasons Mrs. Finkle's motion to dismiss the third-party complaint was denied on July 25, 1996.
The Defendant's Rights in Corcoran's Transportation, Inc. andEJC Transportation, Inc.
The Supreme Court in Krafick v. Krafick, 234 Conn. 783, 792
(1995), adopted the term "all-property equitable distribution scheme" to describe the effects of Section 46b-81's authorization of the court in a dissolution action to assign "to either the husband or wife all or any part of the estate of the other." This scheme "does not limit, either by timing or method of acquisition or by source of funds, the property subject to a trial court's broad allocative power". Id. This principle of equitably distributing the property of the parties to a marriage renders essentially immaterial the great volume of testimony which the court heard concerning the events of the spring and summer of 1993 surrounding Mrs. Corcoran's transfer of her interests in Corcoran Transportation to Mr. Corcoran.
To summarize those events briefly, on May 26, 1993 Mr. and Mrs. Corcoran executed a letter of agreement, describing a CT Page 5433-F "property settlement" which was to become effective "upon the adjudicated dissolution of [the parties'] marriage". (See Exhibit P.) Part of their agreement was that Mrs. Corcoran would assign to Mr. Corcoran all of her right, title and interest in Corcoran's Transportation, and that she would resign from any offices held by her in that corporation. On July 2, 1993 Mrs. Corcoran took both of those steps, even though the dissolution action had not yet been brought. (See Exhibits R and S.) Within two weeks Mr. Corcoran had transferred all of his right, title and interest in those shares to Mrs. Finkle, the third party defendant. (See Exhibit T.) The parties were in serious disagreement over the voluntariness of Mrs. Corcoran's transfer of the shares and the intentions of the parties surrounding that transfer. Assuming without deciding that these were voluntary acts on Mrs. Corcoran's part, the court does not believe that they affect either the court's power equitably to distribute this asset of the parties or Mr. Corcoran's obligation to maintain that asset subject to the court's power to distribute it at the time of a dissolution of the parties' marriage. In addition, from November 29, 1993 forward Mr. Corcoran was restrained by order of the court, to which he had agreed, from "removing, sequestering, hiding or transferring any of the parties' jointly held or separately owned real or personal assets." (See #104 in the file.) Had Mr. Corcoran continued to own and operate Corcoran's Transportation, the court would have distributed that asset at the time of dissolution and had the power even to transfer his interest in the corporation to Mrs. Corcoran. See Kroop v. Kroop, 186 Conn. 211,219-21 (1982).
Therefore, even assuming that the transactions in May and July of 1993 were sufficient to transfer to Mr. Corcoran all of Mrs. Corcoran's right, title and interest in Corcoran's Transportation, it does not follow that Mr. Corcoran was free to dispose of it in a manner that would defeat Mrs. Corcoran's equitable claim to a share in that business. What those events do show is Mr. Corcoran's admission that Mrs. Corcoran was an owner of Corcoran's Transportation, and that he could not transfer the corporation to Mrs. Finkle without her agreement. What those events also demonstrate is a clear intention on the part of Mr. Corcoran and Mrs. Finkle, once Mrs. Corcoran was out of the picture, to carry on the business of Corcoran's Transportation and EJC Transportation together, in a merged corporation of which Mr. Corcoran would be president, director and sole shareholder. (See Exhibits T, U and 2.) When their intention CT Page 5433-G was frustrated by Mrs. Corcoran's contest of this divorce, they sought to carry out their plans through a new corporation, E. J. Corcoran Transportation, to which the business of Mr. and Mrs. Corcoran's corporations was transferred.
The question before the court at this stage of the proceedings is whether Mr. Corcoran's conveyance of the shares of stock to Mrs. Finkle and their actions in transferring the business of Corcoran's Transportation to Mrs. Finkle's corporation "removed property from the marital estate that would otherwise have been subject to equitable distribution".Tessitore v. Tessitore, 31 Conn. App. 40, 42 (1993). Further, a party seeking to set aside a conveyance as fraudulent bears the burden of proving that the conveyance was made without substantial consideration (constructive fraud) or that the conveyance was made with fraudulent intent in which the transferee participated (actual fraud). Id. In dissolution actions, where courts have found a fraudulent transfer of a marital asset, the relief has varied. In some cases lump sum alimony in an amount sufficient to redress the fraud has been ordered. See Miller v. Miller, 22 Conn. App. 310 (1990); Watsonv. Watson, 221 Conn. 698 (1992). In other cases the trial court's order conveying to the injured spouse the property fraudulently transferred has been upheld. See Farrell v.Farrell, 36 Conn. App. 305 (1994).
Mrs. Corcoran, as the party alleging fraud, has the burden of proving that fraud by clear and convincing evidence. Puro v.Henry, 188 Conn. 301 (1982); Gaudio v. Gaudio, 23 Conn. App. 287,307 (1990). Her burden is sustained if the evidence introduced induces in the mind of the trier of fact "a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." Dacey v. Connecticut Bar Association, 170 Conn. 520,537 (1976). Applying that standard of proof, this court is convinced by the totality of the evidence, both testimonial and documentary, that Mr. Corcoran's transfer of the stock of Corcoran's Transportation to Mrs. Finkle in July 1993 was intended to deprive Mrs. Corcoran of her equitable share in that business, in which she had played such a substantial role.[3] The court is further convinced that Mrs. Finkle knew of the existing marital problems between Mr. and Mrs. Corcoran and of Mr. Corcoran's intention to obtain a divorce from Mrs. Corcoran, that he was conveying the stock of EJC Transportation and CT Page 5433-H Corcoran's Transportation and, later, the business of the corporations to her with a fraudulent intent, and that she participated in that fraud. The court believes that there is no other reasonable conclusion that can be drawn from the evidence.
The following specific findings support the conclusion that Mr. Corcoran fraudulently transferred to Mrs. Finkle the business of Corcoran's Transportation with the intent to deprive Mrs. Corcoran of her equitable interest in that business. First of all, that business represented the only significant asset of the parties in 1993. While Mrs. Corcoran still resided in the former family home, a foreclosure judgment had been entered as early as 1991. Moreover, the significant events evidencing a transfer of the Corcoran's Transportation business to Mrs. Finkle occurred in 1994, after this dissolution litigation was in progress.
During all of the relevant period in 1993 and 1994 Mr. Corcoran and Mrs. Finkle enjoyed both a personal and a business relationship. Within a couple of months after their meeting in February 1993 Mr. Corcoran was living in Mrs. Finkle's building, although he denied living with her. The parties travelled to Florida and stayed in the same motel room, although they denied any sexual relationship. Mr. Corcoran testified that Mrs. Finkle and he were engaged to be married at one time. Although Mrs. Finkle denied that they had been engaged, she affirmed that she had been in love with Mr. Corcoran.
Mrs. Finkle had no prior experience in the trucking business whatsoever when she formed E.J. Corcoran Transportation in November of 1994. Her choice of this particular name for the corporation is telling in itself. E.J. Corcoran Transportation has been involved since its inception in the same type of trucking business as Corcoran's Transportation except for long hauling. Mr. Corcoran acknowledged referring $40,000 to $50,000 of business to E.J. Corcoran Transportation in the short period of time it was in business in 1994 and placing E.J. Corcoran, an ostensible competitor, on the insurance policies of Corcoran's Transportation in November of that year. In particular, the business of Caldor's, a major account, and the billing for that business was transferred to E.J. Corcoran Transportation in November 1994. (See Exhibit 30.) He advised Mrs. Finkle in the setting up of E.J. Corcoran Transportation and made Corcoran's Transportation's customer lists available to her. Mrs. Finkle testified that she used those customer lists in CT Page 5433-I developing business for E.J. Corcoran.
As an employee of E.J. Corcoran Transportation Mr. Corcoran has the same job title he had at Corcoran's Transportation and plays the same role. Catherine Nygren, a trucking broker who does extensive business with E.J. Corcoran Transportation, testified that, while she deals with Mrs. Finkle when Mr. Corcoran is not available, he makes the decisions. Although Mr. Corcoran insists he is simply an employee of E.J. Corcoran Transportation, with a weekly salary of $500, his testimony demonstrated that he is able to help himself on a weekly basis to additional funds to pay his alimony and living expenses without any accountability for the amount withdrawn by him.
Perhaps most significant to the court's conclusion is Mr. Corcoran's failure to make any effort to sell Corcoran's Transportation. In a financial affidavit which he signed and swore to on October 21, 1994 Mr. Corcoran valued the stock in Corcoran's Transportation at $185,000. (See Exhibit 11) Moreover, in the 1994 corporate tax return of Corcoran's Transportation (Exhibit 7), according to Schedule L, the corporation's assets exceeded its liabilities by $123,000[4], and the corporation reported gross sales of $780,000. Even if the cash flow of the business was as bad as he testified and the overall business was declining, this would not have been the first business in that condition to have been purchased by a willing buyer with intentions of reversing its decline. Mr. Corcoran's testimony makes it clear that he never made even an effort to locate such a buyer. Rather, he gradually referred his customers to E.J. Corcoran Transportation, Mrs. Finkle's corporation, until he shut down the business of Corcoran's Transportation and went to work for Mrs. Finkle at E.J. Corcoran Transportation.
Mrs. Finkle admitted that she testified in a deposition on May 11, 1995 that what was going on was the transfer of the business known as Corcoran's Transportation to E.J. Corcoran Transportation, her company, although she denied that at trial.
The only countervailing evidence is found in Mrs. Finkle's and Mr. Corcoran's testimony that she had loaned Corcoran Transportation approximately $101,000 in 1994 to meet its expenses. These alleged loans were made in 1994, if they were made, subsequent to Mr. Corcoran's transfer of his stock interest in Corcoran's Transportation to Mrs. Finkle. Mr. CT Page 5433-J Corcoran acknowledged that he signed no notes either personally or on behalf of the corporation, and no documentation of any kind was introduced to support the claim that these loans were made or, if they were made, the amount or terms of these loans. While no evidence contradicting testimony regarding these loans was introduced, the court is not bound to accept facts as proven simply because there is no contradictory evidence. Berchtold v.Maggi, 191 Conn. 266, 272 (1983); Anderson v. Anderson,191 Conn. 46, 55 (1983).
This finding as to Mr. Corcoran's fraudulent intent and Mrs. Finkle's participation therein is further supported by Mr. Corcoran's sale of trucking equipment valued in 1992 (Exhibit 28) at $219,500 without notice to or an accounting of the proceeds of that sale to Mrs. Corcoran, despite the existence since November 1993 of a restraining order prohibiting such transfers and a separate order of May 16, 1994 requiring an accounting for the sale proceeds. In addition, in late 1995 Mr. Corcoran sold to another party one of Corcoran's Transportation's trucking authorizations in order to pay an arrearage in alimony, without notice to or an accounting of the proceeds to Mrs. Corcoran.
In the face of these findings, what other conclusion is possible than that Mr. Corcoran and Mrs. Finkle intentionally effected a transfer of the business out of Corcoran's Transportation and into E.J. Corcoran Transportation with the intent of depriving Mrs. Corcoran of her equitable interest in the business, which Mr. Corcoran and she had worked together to establish and build?
The Plaintiff's Continuing Duty To Support The Defendant
Although this was a marriage of relatively limited duration, eight years from the date of the marriage to the return date, the court believes the plaintiff has a continuing duty to support the defendant for a period of time.
At the present time Mr. Corcoran's income, earning capacity and employability are considerably greater than Mrs. Corcoran's. Mr. Corcoran has understated his earning capacity throughout this litigation and, indeed, his actual income. Whether measured against his realistic income from Corcoran's Transportation or measured against other options available to him, Mr. Corcoran's earning capacity is greater than what he presently CT Page 5433-K reports as gross wages, i.e., $500 per week as Mrs. Finkle's employee. For example, Mr. Corcoran testified that a union truck driver makes $19 an hour with benefits, and he receives considerably less than that, without benefits, from Mrs. Finkle for work days he claims to be 12 hours long. In addition, Mr. Corcoran did not look for any other employment when he wound up the affairs of Corcoran's Transportation and went to work for Mrs. Finkle and has not looked for other employment since that time. In 1994, while he was operating Corcoran's Transportation, his real compensation, as reported on the corporate tax return he signed as president, was about $59,000. As late as October 1994 Mr. Corcoran was reporting a gross weekly income of over $930 and a net of $765 derived from Corcoran's Transportation. According to his own testimony, and that of Mrs. Finkle he left that job just a few months later to take his present position with Mrs. Finkle's corporation at a gross weekly wage of $500.
On the last day of trial, however, it became clear that Mr. Corcoran is able to help himself to funds at Mrs. Finkle's company without any real accounting or limits, in order to pay his alimony and living expenses. Therefore, his consistent statement of weekly income in the amount of $500 is demonstrably false.
Mrs. Corcoran testified at some length as to an arthritic condition and produced medical testimony in support of that claim. The doctor testified, however, that he had not seen Mrs. Corcoran for these complaints since 1987 except for a visit in 1995 for evaluative not treatment purposes. Moreover, this condition existed in 1985 when Mrs. Corcoran was actively employed at Corcoran's Transportation and working a demanding schedule of at least 40 hours per week, according to her testimony. At a deposition on January 13, 1995 she testified that her symptoms were no worse at that time than ten years earlier. Finally, according to her proposed orders and her arguments at trial, she is requesting that the court return her to the demands of operating a trucking company, and it is unlikely that she would be able to meet those demands if her physical condition is as debilitating as she claims it to be. She has made virtually no efforts to secure employment of any kind since she left her employ at Corcoran's Transportation in 1993, and the court is not convinced that her medical condition is such as to preclude any employment on her part.
Based on the testimony admitted at trial, the court is CT Page 5433-L unable to make any finding as to the parties' respective roles in the breakdown of their marriage.
Conclusion
The court concludes that Mrs. Corcoran is entitled to compensation for the fraudulent transfer of the shares of stock and the business of Corcoran's Transportation and EJC Transportation to Mrs. Finkle's company, E.J. Corcoran Transportation, by Mr. Corcoran with the participation of Mrs. Finkle. Based on the only reliable evidence introduced at trial as to the value of Corcoran's Transportation at the time of its effective transfer; viz., Mr. Corcoran's financial affidavit of October 21, 1994, the court finds that the value of Mrs. Corcoran's interest in Corcoran's Transportation at the time of the transfer was one-half of the value shown by Mr. Corcoran on his affidavit, i.e., $92,500.
No evidence was introduced at trial on the subject of Mrs. Finkle's financial circumstances or those of her solely-owned corporation.[5] Therefore, in order for the court to enter appropriate equitable orders compensating Mrs. Corcoran in accordance with the court's finding, a hearing must be held concerning Mrs. Finkle's financial condition and that of her corporation and the availability of the assets and earnings of the corporation to satisfy her obligations, as a third party defendant, to Mrs. Corcoran. That hearing is scheduled for 2:00 p.m. on Friday, November 1, 1996. At that hearing Mrs. Finkle is ordered to appear and produce the following records: a signed and sworn financial affidavit, her individual tax returns for 1994 and 1995, corporate tax returns of E. J. Corcoran Transportation, Inc. for 1994 and 1995, and comprehensive financial records for the corporation showing its assets, liabilities, income and expenses since its incorporation in 1994 and continuing through June 30, 1996. Copies of those documents shall be provided to all counsel no later than one week prior to the hearing. The plaintiff and the third party defendant are ordered to make no transfers of personal or corporate assets until the court has entered orders in this matter.
The court has also concluded that Mrs. Corcoran is entitled to continuing support from Mr. Corcoran for a period of time. One factor to be considered by the court in determining her need is the extent of property distributions made to her pursuant to Section 46b-81 of the General Statutes. Therefore, the court is CT Page 5433-M unable to determine the amount of her need until after the hearing scheduled for November 1, 1996.
Following the hearing on November 1, 1996, the court will enter an order dissolving the marriage of the parties and attendant orders in accordance with this memorandum and the evidence introduced at that hearing.
/s/ Shortall, J. ------------------- SHORTALL